IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KAYIE SHAUNE DEVORE WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24CV382 |
| | ) | |
| GENO RANSOM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Kayie Shaune Devore Wright, housed in the maximum control unit at Scotland Correctional Institution ("SCI"), alleges he was the victim of excessive force twice in one day – first, when a detention officer tased Wright after he refused to return to his cell and/or submit to handcuffs and, second, when three detention officers assaulted him while he was in the medical exam room for an assessment of any taser-related injuries. Pursuant to 42 U.S.C. § 1983, Wright sued detention officers and others at SCI (in their individual and official capacities) for the use of excessive force, interference with his free exercise of religion, and obstruction of access to the grievance process in violation of his constitutional rights. *See generally* Compl., Docket Entry 2. He seeks injunctive relief and $7.2 million in damages. *See id.* § IV. ¶¶ 1–13.

The defendants – Geno Ransom, Cody Petrella, Leonard Bullard, David McGill, Amber Hargrove, Jaqueline Garrison, and Paula Sanderson – have now moved for summary judgment on all claims.[1] They submitted declarations, an incident report, other associated documents, and surveillance footage in support of their motion. Wright responded in opposition with his own declaration.

There are genuine disputes of material facts about the alleged assault on Wright in the medical exam room. But there are no such disputes about the use of the taser to gain

[1] The Court previously dismissed the claims against defendants Wilcox, Webb, and Doe. *See* Order & J., Docket Entry 19.

Wright's compliance, his free exercise of religion, or his participation in the prison grievance process.

Therefore, the Court should grant summary judgment on (1) the official capacity claims for damages and injunctive relief, (2) the claim against Hargrove and Garrison for violating Wright's religious rights, (4) the claim against Sanderson and Garrison for interfering with Wright's participation in the grievance process, and (5) the claim against Ransom and Petrella for excessive force arising from the use of the taser in the pod. The Court should also find that Sanderson, Garrison, Ransom, and Petrella are entitled to qualified immunity on those respective claims.

The Court should deny summary judgment on the claim against Bullard, Petrella, and McGill for excessive force arising from the alleged assault and, accordingly, deny them qualified immunity on that claim at this stage.

After the defendants moved for summary judgment, Wright moved for appointment of counsel. *See* Docket Entries 37, 39. Should any portion of this action survive summary judgment, the Court should grant the motion and endeavor to appoint Wright pro bono counsel.

## I. FACTS

The following facts are undisputed unless otherwise noted. In December 2023, Wright was in his eleventh year of a nineteen-year sentence for murder. *See* Geno Ransom Decl. ¶¶ 4, 5 (May 26, 2026), Docket Entry 32-1. In those years of incarceration, he had been convicted of 211 institutional infractions and was considered a high-security threat. *See id.* ¶ 5 (citing Ex. B to Decl.). Consequently, he was housed in the maximum control unit, or the Gray Unit, at SCI at the time of the events in question.[2] *See id.*

At approximately 11:10 a.m. on December 11, 2023, Sergeant Amber Hargrove saw Wright "escape" from his cell in the maximum control unit, and she issued an alert. *See* Amber Hargrove Decl. ¶¶ 4, 5 (May 29, 2026), Docket Entry 32-12; Incident Report (Ex. D to Ransom Decl.), Docket Entry 32-5 (describing Wright as having "popped out of his cell, without staff asking for his door to be opened and without the control booth operator opening his cell door"); Video of Use of Force at 0:00:08–10 (Ex. G to Ransom Decl.), Docket Entry 32-8.[3]

Once out of his cell, "Wright walked freely in his pod and, using a white cup, threw bodily fluids at [Hargrove] through the pod's gated door."

[2] Wright has since transferred to another facility. *See* Ransom Decl. ¶ 6.

[3] The defendants manually filed with the Clerk of Court copies of Exhibits G, H, and I to Ransom's Declaration, each of which is a video associated with the incidents in question. Ransom attested that they are true and accurate copies of the respective video recordings. *See* Ransom Decl. ¶ 24.

Hargrove Decl. ¶ 6; Video of Use of Force at 0:00:11–21.

Sergeant Geno Ransom arrived at the B-Pod in the unit after receiving Hargrove's alert and saw Wright had escaped from his cell and was walking around the pod. *See* Ransom Decl. ¶¶ 7, 8. Ransom "knew that Wright was a particularly dangerous offender because he had previously assaulted staff with a weapon, had been involved with a gang, and was in the maximum control unit." *Id.* ¶ 10.

Housing Unit Manager Petrella and Officer Leonard Bullard also responded. *See id.* ¶ 9. Ransom either ordered Wright several times to submit to handcuffs or to return to his cell; he refused Ransom's orders. *See id.* ¶ 11; Hargrove Decl. ¶¶ 5, 7; Leonard Bullard Decl. ¶ 5 (May 21, 2026), Docket Entry 32-11; Incident Report (Ex. D to Ransom Decl.), Docket Entry 32-5; Video of Use of Force at 0:01:08–33 (showing officers pointing towards Wright's cell).

Ransom, Petrella, Bullard, and Hargrove then entered the pod, and Ransom again ordered Wright to submit to handcuffs. *See* Ransom Decl. ¶ 11; Hargrove Decl. ¶ 8; Video of Use of Force at 0:01:34–42. Wright refused. *See* Hargrove Decl. ¶ 9. After Wright continued to ignore Ransom's orders, Ransom deployed his taser, and two electric prongs hit Wright's left shoulder and left side near his buttocks. *See* Ransom Decl. ¶ 12; Hargrove Decl. ¶ 9; Video of Use of Force at 0:01:43. Petrella then promptly removed the two prongs from Wright. *See* Ransom Decl. ¶ 13. Hargrove asked an officer to retrieve the leg restraints from the unit control room. *See* Hargrove Decl. ¶ 10. Bullard handcuffed Wright. *See* Bullard Decl. ¶ 6.

Once Wright was under control and in handcuffs and leg restraints, Ransom, Petrella, and Bullard escorted him to the medical exam room. *See* Ransom Decl. ¶ 14; Bullard Decl. ¶ 7; Incident Report; Video of Escort to Exam Room at 0:00:01–24 (Ex. H to Ransom Decl.), Docket Entry 32-9; Video of Exam Room at 0:00:01–18 (Ex. I to Ransom Decl.), Docket Entry 32-10.[4] Sergeant David McGill, Dr. Cummings, and the nursing staff joined the officers and Wright in the exam room. *See* Ransom Decl. ¶ 15; David McGill Decl. ¶ 4 (May 25, 2026), Docket Entry 32-13.

What happens next in the exam room, though, is disputed.

According to the defendants, Wright was calm, but, without warning, he spat in the faces of the officers and nurses. *See* Ransom Decl. ¶ 16; Bullard Decl. ¶ 8; McGill Decl. ¶ 5. Wright also attempted to jump up from the exam chair and lunged at

---

[4] This is a video of the hallway outside of the exam room. There is no footage from inside the exam room due to HIPPA guidelines. *See* Incident Report.

Ransom. *See* Bullard Decl. ¶ 8; McGill Decl. ¶ 5.

Ransom, Bullard, and McGill helped take Wright to the floor to gain control, but Wright was combative, his face was struck and injured, and he continued to try to spit (what was now blood) at staff. *See* Ransom Decl. ¶ 17; Bullard Decl. ¶ 9; McGill Decl. ¶ 6; Incident Report. The defendants aver that they did not "punch, kick, hit, strike, or otherwise assault Wright." *See* Ransom Decl. ¶ 19; Bullard Decl. ¶ 11; Hargrove Decl. ¶ 12; McGill Decl. ¶ 8.

On the other hand, Wright declares under penalty of perjury that Bullard punched him in the face and Petrella kneed him in the face as Petrella and McGill pulled him to the floor. *See* Kayie Shaune Devore Wright Decl. ¶ 10, Docket Entry 38. And they did so without provocation. *See id.* ¶¶ 8, 9, 11 (implying he did not spit at anyone or lunge at Ransom). Bullard then left to retrieve scissors to have McGill and Petrella cut Wright's hair. *See id.* ¶ 10.

There is no dispute, though, that, after the events in the medical exam room, McGill and other detention officers took Wright to the facility's main medical unit. *See* Ransom Decl. ¶ 18; Bullard Decl. ¶ 10; McGill Decl. ¶ 7. And Wright was then seen at an outside medical facility. *See* Incident Report.[5]

## II. STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). For example, when there is an unchallenged video, a court "must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." *Iko v. Shreve*, 535 F.3d 225, 230 (4th

[5] In his Complaint, Wright alleged that, when he returned from the outside medical facility, Hargrove and Garrison had destroyed his religious property and Sanderson and Garrison refused to submit or process his grievances. But, now at summary judgment, he has provided no evidence to support those claims. *See infra* at § III.D—E.

Cir. 2008) (citing *Scott*, 550 U.S. at 380).

The moving party bears the burden of establishing the absence of a genuine dispute of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56).

A party cannot rely on statements in a brief to support a motion for summary judgment, because they are not evidence. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 15-CV-559, 2017 WL 11488724, at *1 n.4 (M.D.N.C. Jan. 26, 2017) (collecting cases); *see also Hill v. Carvana, LLC*, No. 22-CV-37, 2022 WL 1625020, at *3 (M.D.N.C. May 23, 2022).

"An affidavit or declaration used to support [summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

## III. DISCUSSION

Title 42, United States Code, Section 1983 "is a federal statutory remedy available to those deprived of rights secured to them by the Constitution and, in a more sharply limited way, the statutory laws of the United States" by persons acting under color of state law. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). A plaintiff bringing suit pursuant to § 1983 must show that a person acting under color of state law violated a constitutional or other federal legal right. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Here, Wright brings several claims pursuant to § 1983: the use of excessive force, violation of his religious rights, and interference with his participation in the grievance process.

### A. The Court should grant summary judgment on the official capacity claims for damages.

As an initial matter, the defendants argue that the official capacity claims against them should be dismissed due to Eleventh Amendment immunity. *See* Br. in Supp. at 10–11 (referring to both sovereign immunity and Eleventh Amendment immunity). They are correct.

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit

against the official's office," and, thus, "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). *Cf. id.* at 71 n.10 (recognizing, though, that "'official-capacity actions for prospective relief are not treated as actions against the State'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

Here, at all relevant times, the defendants were employees of the North Carolina Department of Adult Correction ("NCDAC"). *See* Ransom Decl. ¶ 3; Bullard Decl. ¶ 3; Hargrove Decl. ¶ 3; McGill Decl. ¶ 3; Garrison Decl. ¶ 3; Sanderson Decl. ¶ 3.[6] The NCDAC "is a North Carolina agency." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F..3d 236, 241 (4th Cir. 2020). Thus, the official capacity claims against the defendants are essentially claims against North Carolina.

But, generally, the Eleventh Amendment bars actions against a state unless the state consents, Congress properly abrogates immunity, *see Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253-54 (2011), or the plaintiff seeks prospective injunctive relief for violations of federal law, *see Lee-Thomas v. Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 249 (4th Cir. 2012) (citing *Frew ex rel. Frew v. Harkins*, 540 U.S. 431, 437 (2004)). *Cf. Alden v. Maine*, 527 U.S. 706, 712–13 (1999) ("We have . . . sometimes referred to the States' immunity from suit as 'Eleventh Amendment immunity[,] . . . [a] convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. . . . [T]he States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . .").

Congress has not abrogated a state's immunity from suits arising under § 1983. *See Biggs*, 953 F.3d at 241. And "North Carolina has not consented to being sued under § 1983 and therefore has not waived sovereign immunity in that context." *Singh v. Univ. of N.C. at Chapel Hill*, 659 F. Supp. 3d 659, 669 (M.D.N.C. 2023). Therefore, Wright cannot seek damages against the defendants in their official capacities, and the Court should dismiss those claims.

B. The Court should grant summary judgment on the claims for injunctive relief.

In addition to damages, Wright seeks injunctive relief, but he is no longer housed at SCI. *See* Offender's Transfer History, Ex. C to Ransom Decl., Docket Entry 32-4 (showing

[6] Petrella did not submit a declaration but, according to the other declarations, he was the Housing Unit Manager at all relevant times. Thus, like the officer-defendants, he was an employee of the North Carolina Department of Adult Correction.

Wright's location at Granville CI). Ransom, Bullard, Hargrove, McGill, Garrison, and Sanderson continue to work at SCI, *see* Ransom Decl. ¶ 3; Bullard Decl. ¶ 3; Hargrove Decl. ¶ 3; McGill Decl. ¶ 3; Garrison Decl. ¶ 3; Sanderson Decl. ¶ 3, and there is no evidence that Petrella works at any other facility including Graville CI.

Therefore, as the defendants recognize, Wright's requests for relief enjoining the actions of SCI and the defendants are moot. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there."). Were he to return to SCI, "he would have sufficient opportunity to re-initiate an action seeking injunctive relief" should he need to do so. *See id.* (noting, therefore, "it is unlikely that it would persist in evading judicial review").

The defendants also correctly note that, to the extent Wright seeks injunctive relief on behalf of other inmates, he lacks standing to do so. *See* Br. in Supp. at 9-10; *see also Hicks v. Berkeley Cnty.*, No. 8:25-cv-13989-RMG-WSB, 2026 WL 679123, at *4 (D.S.C. Jan. 23, 2026) (collecting cases), *report and recommendation adopted*, 2026 WL 412423 (D.S.C. Feb. 13, 2026).

Therefore, the Court should dismiss Wright's request for injunctive relief.

### C. The Court should grant in part and deny in part summary judgment on the excessive force claims.

The heart of this action is Wright's allegation that the defendants used excessive force against him in violation of the Eighth Amendment when (1) Ransom deployed his taser and Petrella removed the prongs without medical approval while in the pod and (2) Bullard punched him in the face and Petrella kneed him in the face as he and McGill took Wright to the floor in the medical exam room. The defendants argue that neither incident involved excessive force. *See* Br. in Supp. at 13–15. They are correct about the administration of the taser, but not so about the assault in the medical exam room.

An inmate's right to be free from the use of excessive force derives from the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *see also Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (stating the same). A claim for the use of excessive force "involves both an objective and a subjective component." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021).

"The objective component measures the nature of the force employed,

asking whether that force 'was sufficiently serious to establish a cause of action.'" *Id.* (quoting *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019)). "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." *Id.* (citing *Brooks*, 924 F.3d at 112).

"The more demanding . . . subjective component . . . asks a single question: whether the officers acted with a 'sufficiently culpable state of mind,'" *id.* (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)), that is, "wantonness in the infliction of pain," *id.* "In contrast to the objective component, this is a demanding standard." *Brooks*, 924 F.3d at 112–13. The plaintiff must establish that the officer applied force "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Dean*, 984 F.3d at 302.

For example, an officer acts in good faith when confronting "immediate risks to physical safety" and "compelling compliance with prison rules and procedures" to "preserve internal order." *Brooks*, 924 F.3d at 113 (citing *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992)).

The United States Supreme Court recognized long ago that "corrections officials must make their decisions 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 320). They "must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." *Id.* Accordingly, "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Whitley*, 475 U.S. at 321–22) (alteration in *Hudson*).

But an officer crosses the line and acts maliciously and sadistically, for example, "when [he] inflict[s] pain . . . to punish an inmate for intransigence or to retaliate for insubordination," *Brooks*, 924 F.3d at 113–14, n.4 (citing cases finding a reasonable jury could infer the officer used excessive force in response to the inmate's use of profanity and threats of violence and other similar statements directed at officers), or "to punish or retaliate against an inmate for his prior conduct," *Dean*, 984 F.3d at 302, and possibly when the officer "use[s] force on an inmate who is restrained and compliant and posing no physical threat," *id.* (noting this conduct "raises the specter of such an impermissible motive") (internal quotations omitted).

"[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37

(2010) (quoting *Hudson*, 503 U.S. at 7).

To determine the nature of the force, courts assess "[1] the need for application of force, [2] the relationship between that need and the amount of force used, [3] the threat 'reasonably perceived by the responsible officials,' and [4] 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

"If a reasonable jury could find, based on the inferences drawn under the *Whitley* factors or other evidence, that correctional officers used force maliciously to punish or retaliate against an inmate, then summary judgment [in favor of the officers] is not appropriate." *Dean*, 984 F.3d at 303–02.

1. The Court should grant summary judgment and qualified immunity on the excessive force claim arising in the pod.

No one disputes that the use of a taser, "an instrument designed to inflict excruciating pain," suffices for the objective component of Wright's excessive force claim arising in the pod. *See Brooks*, 924 F.3d at 115. The purported dispute here focuses on the subjective component. But the undisputed facts show that neither Ransom nor Petrella used force maliciously to punish or retaliate against Wright.

Applying the *Whitley* factors confirms this. Ransom needed to use force because Wright, who was unrestrained, repeatedly refused to obey orders to return to his cell. And Wright does not dispute that he refused to follow orders, whether they were orders to submit to handcuffs or to return to his cell.[7] Only *after* he continued to disobey orders after the officers entered the pod did Ransom deploy his taser. In other words, Ransom attempted to avoid using force and only did so when Wright would not comply. At the time Ransom deployed his taser, he not only knew Wright was housed in the maximum control unit, but he also knew that Wright had previously assaulted staff and been in a gang — information supporting Ransom's reasonable perception that Wright was a threat to officer safety.[8]

---

[7] Wright attempts to discredit Ransom's declaration by pointing out discrepancies in his statements (that he ordered Wright to submit to handcuffs) and Hargrove's witness statement (that Ransom ordered Wright to return to his cell). *See* Wright Decl. ¶ 7 (noting also that Hargrove's declaration states that Ransom ordered Wright to submit to restraints). But Wright does not deny that he refused Ransom's orders.

[8] Wright takes issue with Ransom's reliance on his infraction history, claiming that 90% of them are false, *see* Wright Decl. ¶ 4, but he provides no such evidence. He also challenges the use of "prior-Bad-acts evidence," *see id.*, but it is permissible for the court to consider Ransom's knowledge about Wright's

Furthermore, there is no evidence that Ransom deployed his taser after Wright fell to the ground. Wright speculates about a possible second deployment after officers rolled him over. *See Brooks*, 924 F.3d at 115 ("[A] reasonable jury viewing the three shocks together — three uses of an instrument designed to inflict excruciating pain in under 70 seconds — could infer 'wantonness in the infliction of pain,' intended not to restore order and induce compliance, but to punish Brooks for his belligerence."). But there is no evidence to support such a theory. "Unsupported speculation is not sufficient to defeat a summary judgment motion." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 659 (4th Cir. 2020) (citing and quoting *Felty v. Graves-Humphreys Co.*, 818 F.3d 1126, 1128 (4th Cir. 1987)).

There is no evidence suggesting that Ransom deployed his taser for any reason other than to address Wright's repeated refusal to obey orders and reenter his cell. In other words, there is no evidence that Ransom wantonly inflicted pain or used force maliciously or sadistically. *Cf. Perry v. Guill*, No. 1:22-CV-872, 2024 WL 730281, at *2 (M.D.N.C. Feb. 22, 2024) (finding a reasonable inference that the detention officer's use of a taser on the inmate was to punish him for using the intercom repeatedly to report a malfunctioning toilet and for challenging the officer, over the intercom, to a fight). Instead, the only evidence in the record shows that Ransom was doing precisely what the Supreme Court has recognized he must do: preserve internal order and discipline and maintain institutional security.

Wright argues that Petrella used excessive force when he removed the taser prongs without medical approval while Wright was in the pod. But he cites no caselaw finding that the removal of taser prongs, without more, is a serious use of force in the first place. *Cf. Brewton v. Smith*, No. 0:25-CV-1073-RMG-WSB, 2026 WL 911957, at *16 (D.S.C. Mar. 12, 2026) (declining to award the plaintiff summary judgment on his § 1983 excessive force claim even where the defendant tased the plaintiff *and removed* the prongs), *report and recommendation adopted*, 2026 WL 1266106 (D.S.C. May 9, 2026); *Stroud v. Tapp*, No. 1:20-cv-00226-MR, 2022 WL 4100227, at *3-4 (W.D.N.C. Sept. 7, 2022) (finding the officers did not use excessive force even when someone removed the taser prongs from the plaintiff before he was in a medical setting).

And, as with Ransom, there is no evidence that Petrella's removal of the prongs from Wright was wanton or malicious. Accordingly, the Court should grant their motion for summary judgment on this portion of the excessive force claims.

---

history when assessing Ransom's use of force.

Additionally, Ransom and Petrella contend that qualified immunity bars this claim against them, and they are correct insofar as this portion of the excessive force claim.

"The doctrine of qualified immunity 'balances two important interests,' namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform their duties responsibly from 'harassment, distraction, and liability.'" *Byers v. Painter*, 173 F.4th 155, 160 (4th Cir. 2026) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity shields government officials from civil liability unless a plaintiff shows both (1) that the official violated a constitutional right and (2) that the right was clearly established at the time of the violation. *Pearson*, 55 U.S. at 232.

"In resolving whether to award qualified immunity at summary judgment, courts are to engage in a 'two-pronged inquiry.'" *Nazario v. Gutierrez*, 103 F.4th 213, 230 (4th Cir. 2024) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655 (2014)). First, the court determines whether "in a light most favorable to the injured party – 'the officer's conduct violated a constitutional right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Next, the court asks "whether the right at issue in the first prong was 'clearly established at the time' of the contested action." *Id.* (quoting *Pearson*, 555 U.S. at 227). "Accordingly, a court may award qualified immunity to an official if either (1) there is no violation of a constitutional right, or (2) the constitutional right was not clearly established." *Id.* (citing *Pearson*, 555 U.S. at 227).

Here, because the undisputed evidence shows that neither Ransom nor Petrella violated Wright's constitutional rights during this incident in the pod, they are entitled to qualified immunity.

2. The Court should deny summary judgment on the excessive force claim related to the medical exam room and deny qualified immunity.

Wright also claims that Bullard, Petrella, and McGill used excessive force when they punched and kneed him in the face as Petrella and McGill took him to the floor of the medical exam room. Although the defendants argue there are no genuine disputes of material fact, they are mistaken.

Ransom, Bullard, and McGill all aver nearly identical narratives about what took place in the medical exam room, none of which constitute constitutional violations. Not long after Wright arrived in the exam room and calmed down, he unexpectedly began spitting or attempting to spit at correction officers and medical staff, then jumped up from the chair, and lunged at Ransom.

Ransom, Bullard, and McGill aver that each assisted "in placing Wright

on the floor to gain control." Once on the floor, Wright was combative and continued to try to spit at staff. According to the Incident Report, Wright fell and his face struck the floor causing injury. Ransom, Bullard, and McGill contend that they did not punch, kick, hit, or strike Wright and they did not see any other staff assault Wright that day. They do acknowledge, though, that officers escorted Wright to the facility's medical unit afterwards because of the injuries he sustained in the exam room, and the Incident Report notes that he received subsequent evaluation and treatment outside of the facility.

Wright's perspective is quite different. And all reasonable inferences are construed in his favor. Wright implicitly denies spitting[9] or lunging at anyone[10] and unequivocally avers that, not only did Bullard punch him in the face, but Petrella also kneed him in the face as he and McGill pulled Wright to the floor. As a result, Wright needed outside medical treatment for his injuries. This suffices as an objectively serious use of force, *see, e.g.*, *Hudson*, 503 U.S. at 10 (finding that "blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not *de minimis* for Eight Amendment purposes").

Turning to the subjective prong of this claim, applying the *Whitley* factors, and construing the facts in the light most favorable to Wright, a reasonable jury could find that Bullard, Petrella, and McGill violated his right to be free from excessive force. Wright, whose hands and legs were restrained, was in the medical exam room to determine if the taser prongs injured him. There were at least four officers in the room. He was not disobeying orders or acting in a disorderly fashion. Suddenly, Bullard punched him in the face and Petrella kneed him in the face as Petrella and McGill took him to the ground.

A reasonable jury could find, according to these facts, that there was *no* need for the use of any force. Wright posed no threat to anyone's safety at the time. Yet Bullard punched him in the face and McGill helped Petrella pull Wright to the ground as Petrella kneed him in the face. Their assault warranted transfer

---

[9] The defendants rely in part on the video footage from the hallway outside of the medical exam room that shows a woman who appears to be a member of the medical staff exit the room and hold her hand up to her face. *See* Br. in Supp. at 16-17. But it cannot be determined as a matter of law that this video depicts what the defendants argue that it depicts. A jury may find that it supports their position. But, at this stage, it does not foreclose Wright's claim. *See Iko*, 535 F.3d at 230.

[10] Wright claims the defendants falsified their statements to hide what happened in the exam room. *See* Wright Decl. ¶¶ 8–13. But all of this is speculation which cannot defeat summary judgment. Nevertheless, other evidence does defeat summary judgment.

to the institution's medical unit and then an outside medical facility to treat the injuries Wright sustained. Without question, "these facts tend to show that the amount of force used was disproportionate to the need for force." *Iko*, 535 F.3d at 240;[11] *see also Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. 2014) (unpublished) (citing *Iko*, 535 F.3d at 239-40 and *Williams*, 77 F.3d at 763 for the proposition that using force – in this case, pepper spray – on a restrained, docile inmate could be excessive); *Greene v. Cnty. of Durham*, No. 1:14-CV-153, 2016 WL 4507355, at *11 (M.D.N.C. Aug. 26, 2016) (finding that "reasonable officers could not reasonably perceive such a threat as justifying punching Mr. Greene in the head after he was handcuffed, stepping on his face while he is immobile on the floor, or encouraging other officers to beat him up").

It follows that a reasonable jury could find that Bullard, Petrella, and McGill used force to punish Wright for his earlier insubordination and belligerence. *See Brooks*, 924 F.3d at 115. After all, Bullard and Petrella witnessed Wright's repeated refusal to follow orders in the pod just before this incident, and Wright had assaulted staff just one month earlier, *see* Kimberly Grande Decl. (Mar. 31, 2025), Ex. 16 to Ransom Decl. Because a jury could find in favor of Wright, summary judgment on this portion of the excessive force claim is not appropriate.

Not only should the Court deny Bullard, Petrella, and McGill summary judgment on this incident, but the Court should also deny them qualified immunity. At the time of this incident, the officers were on fair notice that punching or kneeing (or facilitating the punching or kneeing) a compliant, restrained inmate who posed no physical threat to anyone could be excessive force:

- *Dean*, 984 F.3d at 311 (finding that officers were "on clear notice, in 2015, that the use of . . . kicks and punches . . . against Dean after he had been fully subdued and no longer posed a risk to [officer] safety could give rise to an inference of 'wanton punishment' in violation of the Eighth Amendment");
- *Brooks*, 924 F.3d at 119 ("At the time of the events in question, it was clearly established that a corrections officer's use of force in bad faith – not to preserve order or induce compliance, but to punish through the 'wanton infliction of pain' – violates an inmates Eight Amendment right.");
- *Thompson v. Commonwealth of Va.*, 878 F.3d 89 (4th Cir. 2017) (recognizing that "the right to be free from malicious or penologically unjustified infliction of pain and suffering . . . applies with particular force

[11] It is unnecessary to assess the officer's failure to temper their use of force because there was no need for any amount of force under these facts.

when inmates have not engaged in wrongdoing, are restrained and compliant and posing not physical threat"); and

- *Hall v. McLain*, No. 1:22-CV-1009, 2024 WL 5704407, at *2 (M.D.N.C. June 11, 2024) ("[N]o reasonable corrections officer could believe that it was lawful to kick and beat an inmate who has not resisted or threatened the officer or taken any other action to undermine discipline and order.").

Therefore, under these facts, Bullard, Petrella, and McGill are not entitled to qualified immunity at this stage.

D. The Court should grant summary judgment and qualified immunity on the free exercise of religion claim.[12]

Wright alleged in his Complaint that Hargrove and Garrison discouraged him from exercising his Jewish beliefs by destroying certain religious property – prayer rug, head coverings, Bible, teaching documents – while he was out of the facility and, on two days, denying him kosher meals. *See* Compl. § II.B. (listing the First Amendment); *id.* ¶ 14 (describing Hargrove's and Garrison's actions). But he provides no supporting evidence in response to the defendants' motion. *See generally* Wright Decl. In fact, he does not respond at all to the defendants' motion for summary judgment on this claim.

Instead, he discusses the destruction of property generally but never mentions that any of that property was religious in nature or related to his exercise of religion. *See id.* ¶ 16. Instead, he identifies a "missing Sony radio [that] was never replaced" and claims that the defendants concealed their destruction of property.[13] *See id.* Similarly, there is no evidence that Hargrove or Garrison, or anyone else, denied him Kosher meals despite his allegation otherwise. *See generally* Wright Decl.

Accordingly, summary judgment on this claim is appropriate, as is the granting of qualified immunity to Hargrove and Garrison because there is no evidence that they violated

---

[12] "A prisoner asserting religious liberty claims has at least two arrows in his quiver: the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). *Roberts v. Engelke*, 180 F.4th 634, 638 (4th Cir. 2026). Here, though, Wright only alleged a First Amendment violation. Ultimately, it matters not, because he has abandoned *any* claim of infringement on his religious rights.

[13] Wright claims that the lack of investigation into his alleged behavior shows some sort of quid pro quo: if he did not report the incident or cooperate in the investigation, the defendants would return his property and not falsify documents. *See* Wright Decl. ¶ 15. This wholly unsupported speculation is of no moment.

Wright's right to the free exercise of religion.

E. The Court should grant summary judgment and qualified immunity on the claim related to the grievance process.

Wright alleges that, after these incidents, he gave Sanderson a DC-410 grievance form on December 20, 2023 that she did not submit or process, and he gave Garrison a DC-410 form on December 21 and 29, 2023, neither of which she submitted or processed. *See* Compl. ¶¶ 10, 11, 13. The defendants argue that Wright does not have a constitutional right to engage in a prison grievance process. *See* Br. in Supp. at 20. Wright concedes the point by failing to respond to the defendants' argument and otherwise offers no evidence to support these allegations. *See generally* Wright Decl.; *see id.* ¶¶ 18, 21 (discussing, instead, having provided a DC-410 to Webb who is no longer a defendant and making wholly speculative statements about "staffs" "making it appear as if Plaintiff is deliberately filing (or attempting to file) frivolous DC-410s . . . ").

Not only has Wright abandoned any claim against Sanderson and Garrison based on their failure to submit or process grievances, but the defendants are correct on the merits. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Brooker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) (citing *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994)). An inmate does have a constitutional right to be free from retaliation, though, if he participates in a grievance process. *See id.* at 546. But Wright did not allege that Sanderson or Garrison retaliated against him for doing so. *See generally* Compl.

While he now avers that "defendants and unit staffs" "forced" Wilcox, who is no longer a defendant, to administer his Booster drinks by the cup rather than the carton "in retaliation for filing reports and grievance," he does not identify those defendants, *see* Wright Decl. ¶ 18, and moreover he cannot now amend his complaint by making a statement in his declaration about retaliation he never mentioned before, *see* Fed. R. Civ. P. 15(a)(1)–(2). He contends that "Garrison took cartons to medical room after cell search in a attempt to discontinue medication," although a medical supervisor thwarted her. *See* Wright Decl. ¶ 18. Not only does Wright fail to explain when Garrison did this in relation to the grievances (that she allegedly never processed), but, as just noted, he cannot now amend his complaint to add a claim by way of his declaration. Therefore, summary judgment on this claim is appropriate.

Because neither Sanderson nor Garrison violated Wright's constitutional right related to his grievances, they are each entitled to qualified immunity.

IV. CONCLUSION

**IT IS HEREBY RECOMMENDED** that the Court deny in part the Motion for Summary Judgment, Docket Entry 31, as to the claim of excessive force in the medical exam room and grant the motion as to all other claims; and

**IT IS FURTHER RECOMMENDED** that the Court grant Wright's Motion for Appointment of Counsel, Docket Entry 37, should any portion of this action survive summary judgment.

JoAnna Gibson McFadden
United States Magistrate Judge

November 17, 2026